UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GREGORY R. HIGGINS, JR., | |
| Petitioner, | Case No. 1:15-cv-00483-DCN |
| v. | **MEMORANDUM DECISION AND ORDER** |
| RANDY E. BLADES, | |
| Respondent. | |

On October 13, 2015, Petitioner Gregory R. Higgins, Jr., filed a Petition for Writ of Habeas Corpus challenging his state court conviction. Dkt. 3. The Petition contained one claim—that the state district court abused its discretion imposing a fixed life sentence without the possibility of parole—but it also included the following statement of Petitioner's intent: "After stay and abeyance, I [will] provide federal basis for all claims in an amended petition/format." Dkt. 3, p. 6. The Court stayed this matter to permit Petitioner to exhaust his state court remedies. Dkt. 7.

The Court reopened this case on September 30, 2019, and ordered Petitioner to file an amended petition within 30 days if he desired to add newly exhausted claims from his recent post-conviction action. Dkt. 10. Petitioner did not file an amended petition, and therefore the action proceeded on the original Petition. Respondent filed a Motion for Summary Dismissal on August 17, 2020. Dkt. 17. In response, Petitioner filed an Amended Petition. Dkt. 20.

Having reviewed the record, the Court enters the following Order.

## BACKGROUND

On August 27, 2012, Oswaldo Araujo, a farm worker, called his boss to report that he had found a body on a field road near Nampa, Idaho; Aruaujo's boss called 911. State's Lodging A-4, pp. 296-302. Police officers identified the deceased from his cell phone as James Nathan Groat. He had been shot five times. *Id*., pp. 686-87.

Police investigators interviewed the five most recent contacts found on Groat's cell phone—Christopher "Mikey" Duran, Cruz Flores, and Alex White (all roommates of Groat); and Jesse Dees and Petitioner Gregory Higgins (both friends of Groat). *Id*., pp. 832-33. Police investigators also discovered that Duran was in possession of Groat's car and debit card. Duran and Flores' initial story was that, on the night he was killed, Groat left home with a stripper named Amanda and did not return to his apartment.

Cruz and Duran changed their stories when police investigators targeted them as the "most timid" suspects and interviewed them a second time. At trial, Duran testified that Petitioner said he needed to buy a gun, and Duran had spent the day searching for a gun for Petitioner to buy. Duran set up a gun purchase with a man whose street name was "Zeus." When Groat found out who the seller was, he gave Duran a .38 revolver that he had in his possession (owned by Dees) to lend to Petitioner as a precaution in case there was any trouble with Zeus, "who was known for ripping people off." *Id*., p. 367. Text messages produced at trial corroborated the suspects' communications about the planned gun purchase.

While Duran and Petitioner were at Petitioner's home drinking beer and conversing

with Petitioner's girlfriend Rebecca Scott, and Rebecca's 15-year-old daughter A.D. (who was engaged in a sexual relationship with 24-year-old Duran), Petitioner told Duran that Groat had been "acting really shady" and was "a rat." State's Lodging A-4, p. 368. Duran responded that Petitioner was "tripping" and "needed to calm down." *Id*. Petitioner then asked Duran if he wanted to go bury Groat out by the lake. *Id*. Duran knew Petitioner meant "kill" Groat when he said "bury" him. Duran did not respond. When Petitioner asked him, "[A]re you down to drive to the lake," Duran "pretty much said yes." *Id*.

Petitioner grabbed a shovel, and he and Duran went to the shared apartment of Duran, Groat, Cruz, and White. Petitioner told Groat that he was going to do an "Oxy deal out by the lake" and that he needed people to go with him because the people meeting him there were shady. Groat went to his bedroom and got a speed loader for the gun and was ready to go. Cruz volunteered to come, and Petitioner was reluctant to allow him to do so, but agreed. The four men got into Groat's car.

Instead of going to the lake, Petitioner directed Groat to stop near an abandoned house. They got out of the car to look around. Petitioner followed Groat and then put a gun to his head and began asking him who he was working for and saying that he had been acting really shady lately. Groat said, "I don't work for anybody. I'm a junky. I shoot up." *Id*., p. 379. Petitioner told Duran to get the shovel, and Petitioner made Groat start digging. After Groat had dug a little bit, Petitioner shot him once in the face, and then four more times in the body with the gun that Groat had given Petitioner to protect himself from "Zeus." Petitioner then kicked Groat's body and said, "Are you dead now? Are you dead now?"

While Duran was aware that Petitioner had intended to kill Groat, Flores was completely surprised by the shooting. When the three men were getting back into the car, Petitioner told Duran and Flores, "Now you know how I roll."

Duran took the driver's seat, and as they returned to Nampa, Petitioner directed him to drive through Jack in the Box to pick up some fast food for themselves, Rebecca, and her daughter, A.D. Jack in the Box video surveillance showed Petitioner and the other two men in Groat's car ordering food in the drive-through lane. *Id*., pp. 621-26. Petitioner told Rebecca and A.D. that if anybody asked, he never left the house that night. *Id.*, pp. 380-37. Petitioner gave Duran some free marijuana and amphetamine, and told Duran to smoke it all with Flores so that Flores would hallucinate and not remember anything about the incident. *Id*., p. 393-94. The next day Petitioner texted Duran and said, "Watch Cruz [Flores]. I trust you." *Id*., p. 398.

Petitioner was charged with first degree murder and kidnaping. Duran was charged with aiding and abetting first degree murder, aiding and abetting first degree kidnaping, and engaging in lewd conduct with a minor under age 16, but was offered a plea bargain for less if he testified against Petitioner. Flores was charged with accessory to first degree murder and also testified against Petitioner. A jury found Petitioner guilty of first degree murder. Ada County District Court Judge Molly J. Huskey sentenced Petitioner to life in prison without the possibility of parole.

### CONSIDERATION OF MOTION FOR SUMMARY DISMISSAL

Petitioner's Amended Petition omits the sentencing claim asserted in the original Petition. However, it is unclear whether Petitioner intends to abandon the sentencing claim

or merely supplement it with the Amended Petition. Respondent argues that the sentencing claim—that the district court abused its discretion imposing a fixed life sentence without possibility of parole—is subject to dismissal because it is noncognizable, conclusory, and contains no factual detail. Dkt. 17-1.

While the Court will not summarily dismiss this claim on grounds of lack of factual support because of Petitioner's pro se status, it agrees that Petitioner did not present a federal theory for his sentencing claim either in state court or in his federal petition. *See* State's Lodging B-1; Dkt. 3. Even construing the claim as having a federal basis in the original Petition, the claim faces an additional procedural default hurdle, because the Idaho Supreme Court did not have the first opportunity to rule on it.

The Court ordinarily would give Petitioner leave to show cause and prejudice or a miscarriage of justice to excuse the procedural default. However, a court is not required to address a procedural issue if it decides that a claim is meritless. *Lambrix v. Singletary*, 520 U.S. 518 (1997); *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted); *cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Therefore, as the Court will explain, it has reviewed and will preliminarily deny Petitioner's claims on the merits rather than further address the procedural issues. The Court will provide Petitioner a final opportunity to respond to this notice of intent to deny the claims before the Court considers whether to finally deny the claims and enter

MEMORANDUM DECISION AND ORDER - 5

judgment.

### REVIEW OF SENTENCING CLAIM IN ORIGINAL PETITION

The Court construes the claim in the original Petition as one that his sentence of life without parole violates the Eighth Amendment's Cruel and Unusual Punishment Clause.

### 1. State District and Appellate Court Decisions

Judge Huskey considered various factors at the sentencing hearing to determine Petitioner's sentence of life without parole (State's Lodging A-4, pp. 1289-1365), including the following information.

Petitioner and his sister spent their early years in his father's household. When Petitioner was ten years old, his father could not afford to take care of both children, and so he chose to keep Petitioner's sister and sent Petitioner to live with his mother in a different state. Petitioner "was jumped into a gang" at age thirteen. *Id.*, p. 1357. At about age sixteen, Petitioner attended a 30-day inpatient drug treatment program for major depressive episodes, ADHD, drug and alcohol dependence, and conduct disorder. As of the date of sentencing, Petitioner had accrued nineteen juvenile adjudications (three of which would have been felonies in adult court), fifteen misdemeanor crimes, and five prior felony convictions on his record (two counts of delivery of a controlled substance, possession, burglary, and malicious injury to property).

Petitioner's biological family members were absent from the sentencing proceedings, but he had letters of support sent in from people whom the judge considered "a family that has been created by circumstance." *Id.*, p. 1353. Judge Huskey told

Petitioner, "[Y]ou are loved and you are cherished, and there are people that care very deeply for you." State's Lodging A-4, p. 1353.

Judge Huskey noted the following mitigating factors: "his life growing up, lack of education, lack of job skills, [and] overwhelming and serious and significant substance abuse problems." Aggravating factors included a fairly extensive criminal record and ongoing disciplinary offense reports received in custody (including an unprovoked battery on a jail inmate working as a janitor during the one hour Petitioner was let out of his cell). *Id.*, p. 1320. "You have indicated by your behavior that you either cannot or will not conform your behavior to the rules of society, whether you are in custody or whether you are out of custody," observed Judge Huskey. *Id.*, p. 1354.

Principally, Judge Huskey focused on the "egregious" facts of the crime in crafting Petitioner's sentence:

> It is one thing—and I certainly don't mean to diminish the death of any human being. It is one thing to kill somebody. In this Court's view, it is a completely different circumstance and is unnecessarily cruel to have that individual dig a hole, intimating that he is digging his own grave, before executing him.
>
> And then to casually and callously head over to a fast food restaurant to get some food to take home to you and the individuals that were there. That is not, to the extent there is any ordinary murder, an ordinary murder.
>
> * * *
> Perhaps—and the Court find[s] this the most troubling of all—there was no provocation at all. You simply believed Mr. Groat to be behaving sketchy....[T]o kill another person with little to no provocation, tells me that you are an extraordinarily dangerous individual.

*Id.*, pp. 1355-56. Consequently, Judge Huskey told Petitioner, "the nature of the offense requires that you spend the rest of your life behind bars." *Id.*, p. 1361.

On direct appeal, the Idaho Court of Appeals rejected Petitioner's claim that the sentence was an inappropriate fit for the crime:

> The question before this Court is not what sentence it would have imposed but, rather, whether the district court abused its discretion. *State v. Stevens*, 146 Idaho 139, 148–49, 191 P.3d 217, 226–27 (2008). Where reasonable minds might differ, the discretion vested in the trial court will be respected and this Court will not supplant the views of the trial court with its own. *State v. Windom*, 150 Idaho 873, 875, 253 P.3d 310, 312 (2011).
>
> A fixed life sentence requires a high degree of certainty that the perpetrator could never be safely released back into society or that the nature of the offense requires that the individual spend the rest of his or her life behind bars. *Windom*, 150 Idaho at 876, 253 P.3d at 313. *See also State v. Li*, 131 Idaho 126, 129, 952 P.2d 1262, 1265 (Ct. App. 1998); *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct. App. 1988). At sentencing, the district court specifically recognized that the sentencing decision was committed to its discretion and that it was required to act within the bounds of that discretion through an exercise of reason. The district court discussed the goals of sentencing, as well as the factors set forth in I.C. § 19–2521 and the standard set forth in *Windom* for imposition of a fixed life sentence.

State's Lodging B-4, p. 2. The Idaho Court of Appeals concluded that Petitioner failed to show that the "sentence is unreasonable under any reasonable view of the facts." *Id.*

## 2. Federal Standard of Law

### A. *AEDPA Deferential Review Standard*

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

> 1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 180 (2011); 28 U.S.C. §2254(e)(2). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim (1) was adjudicated on the merits in state court and (2) the underlying factual determination of the state court is not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014). In that case, a "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner must show, by clear and convincing evidence,

that the factual findings are not just erroneous, but unreasonable, in light of the evidence presented to the state courts. 28 U.S.C. § 2254(e)(1); § 2254(d)(2).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S 415, 426 (2014).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However,

circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's factfinding or legal conclusions are incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019). If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

### B.  *De Novo Review Standard*

In the following instances AEDPA's deferential review standard does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

MEMORANDUM DECISION AND ORDER - 11

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

## C. *Sentencing Standards*

It is undisputed that Petitioner was sentenced to a term within the statutory limits for his crime. In *Solem v. Helm*, 463 U.S. 277, 284 (1983), the United States Supreme Court held that, in instances where the defendant is given a life sentence without parole, a federal district court should review whether the sentence is disproportionate to the crime committed, which would be a violation of the Eighth Amendment's Cruel and Unusual Punishment Clause.

In that case, the Supreme Court noted that Helm's crime was "one of the most passive felonies a person could commit." *Id*. at 296. That is, "[i]t involved neither violence nor threat of violence to any person," and, while the "$100 face value of Helm's 'no account' check was not trivial, ... neither was it a large amount." *Id*. In addition, Helm's "prior offenses, although classified as felonies, were all relatively minor, and all "were nonviolent and none was a crime against a person." *Id*. at 296–97.

In the case that followed *Helm*, Justice Kennedy noted in his concurring opinion that life without parole "is the second most severe penalty permitted by law." *Harmelin v.*

*Michigan*, 501 U.S. 957, 1001 836 (1991) (Kennedy, J., concurring in part and concurring in judgment). Because *Harmelin* is a plurality opinion, Justice Kennedy's concurrence generally is considered the narrowest holding of the case—that only "grossly disproportionate" sentences are unconstitutional because the Eighth Amendment includes a narrow proportionality principle. *Id*. at 1001. To engage in a proportionality review, a court must compare the gravity of the offense to the harshness of the punishment. *Id*. at 1004-06. If, after such an analysis, there is an inference of gross disproportionality, then a court must compare the outcome of the case to cases within and without the sentencing jurisdiction to arrive at a conclusion. *Id*. at 1004-05.

The *Harmelin* court affirmed the Michigan court judgment sentencing Harmelin to a statutory mandatory life sentence without the possibility of parole for possessing more than 650 grams of cocaine. In more recent years, when considering life-without-parole sentences imposed upon juveniles, the Supreme Court has observed that "[t]he concept of proportionality is central to the Eighth Amendment," *Miller v. Alabama*, 567 U.S. 460, 469-70 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 59 (2010)), and should be viewed "less through a historical prism than according to 'the evolving standards of decency that mark the progress of a maturing society.'" *Id*., 567 U.S. at 469-70 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

### 3.   Analysis

Petitioner's sentence is assessed according to United States Supreme Court precedent existing at the time the Idaho Supreme Court reviewed and rejected his claim, on October 15, 2014. Petitioner was not a juvenile at the time he committed the crime, and

thus cannot take advantage of the holdings of *Graham* and *Miller*. Under a *Helm* analysis, Petitioner's challenge fails, because his crime was one of extreme cruelty to the victim before inflicting death, rather than a crime of mere monetary or property damage. Petitioner's record of crimes and unprovoked battery on a jail inmate janitor prompted the sentencing court to conclude that he "either cannot or will not conform [his] behavior to the rules of society, whether ... in custody or ... out of custody." State's Lodging A-4, p. 1354. The record shows that Petitioner's crime was far more serious than Helm's crime that led to a life-without-parole sentence. Here, the gravity of the offense warrants the harshness of the punishment. Therefore, the Court preliminarily concludes that Petitioner's Eighth Amendment claim fails on the merits under a de novo review standard. Petitioner may respond to this preliminary conclusion before the Court makes it final decision.

## CONSIDERATION OF THE AMENDED PETITION

In his Amended Petition, Petitioner desires to add several ineffective assistance of counsel claims to his case. The Court will review each, in turn.

### 1. **Failure to Object to Violation of Fifth Amendment Right to Remain Silent**

#### A. *Facts Underlying Claim*

At trial, the prosecutor played for the jury a videotaped recorded interview, "Exhibit 5," wherein a police detective told Petitioner, "[There are] things I didn't get to ask you, maybe I did, but you didn't answer." *See* State's Lodging F-4, p. 1. Petitioner alleges that trial counsel should have redacted that portion of the interview and was deficient in letting et the jury both see and hear him invoke his right to remain silent. Dkt. 20, p. 4. On post-

conviction review, the state courts assumed that trial counsel performed deficiently by failing to screen Exhibit 5. *Id*.

After Exhibit 5 was published, the trial court issued a curative instruction to the jury: "Any reference or testimony that the Defendant may have invoked his Fifth Amendment right is to be stricken and is not to be considered by you for any purpose during your deliberation." *Id*., p. 2. After the close of evidence and before jury deliberations, the court repeated the instruction to disregard the reference to Petitioner's silence. *Id*. The Court also ordered the State to redact the at-issue statement from Exhibit 5 for purposes of sending the evidence to the jury room. *Id*.

### B.  *State Court Appellate Decision*

This claim was decided on the merits by the Idaho Court of Appeals and was implicitly affirmed by denial of the petition for review by the Idaho Supreme Court; therefore, the Idaho Court of Appeals' decision is entitled to AEDPA deference. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

In addressing this claim, the Idaho Court of Appeals reasoned:

> The district court assumed his counsel's performance was deficient for failing to review Exhibit 5 and moving to exclude it. The district court noted Higgins did not allege prejudice as a result of his counsel's failure. Nonetheless, the district court analyzed the possibility of prejudice under *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), namely whether there was a

> reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different. *See, e.g., Aragon v. State*, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988). The district court concluded that, even if the implicit reference to Higgins' right to remain silent in Exhibit 5 had never been published to the jury, the jury would have found Higgins guilty regardless based upon the "overwhelming" evidence against him, and therefore Higgins failed to show prejudice.

State's Lodging F-4, p. 2. The Idaho Court of Appeals further concluded that the trial court's two curative instructions to the jury "cured any possible unfair prejudice the error caused." *Id*., p. 5.

### C. *Federal Standards of Law*

The clearly established law governing a Sixth Amendment claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on an ineffective assistance claim, *Strickland* requires the petitioner to show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In measuring the trial attorney's work under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

To conclude that prejudice occurred under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability

that, but for errors made by counsel, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is defined as one sufficient to undermine confidence in the outcome. *Id*. at 694.

The petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. *Id*. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id*. The *Strickland* standard, giving deference to counsel's decision making, is the de novo standard of review. Then, because habeas corpus is collateral review, another layer of deference to the state court decision is afforded under AEDPA.

The subject matter of the alleged attorney deficiency is the Fifth Amendment's right to remain silent when criminal acts are implicated. The Fifth Amendment is applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489 (1964). The Fifth Amendment right to remain silent contains an implicit assurance "that silence will carry no penalty." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Narrowing the reach of *Doyle,* in *Greer v. Miller*, 483 U.S. 756, 762 (1987), the United States Supreme Court held that there is no *Doyle* violation if the district court promptly sustains a timely objection to a question concerning post-*Miranda* silence, instructs the jury to disregard the question, and gives a curative jury instruction.

If there was an improper comment on a defendant's silence at trial that violated the Fifth Amendment privilege against self-incrimination, the court then undertakes a harmless error review. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993). The *Strickland* prejudice

prong is the equivalent of a harmless error analysis when the Fifth Amendment claim is embedded in an ineffective assistance of counsel claim. *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008); *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).

### D. *Analysis*

Like the state courts, this Court assumes that trial counsel rendered deficient performance by failing to redact the statement that implied Petitioner's silence from the police interview that was published to the jury. Therefore, the question is whether the Idaho Court of Appeals' decision was unreasonable when it determined that no prejudice resulted because of the trial court's curative jury instructions.

Petitioner's facts are not like those in *Doyle*, where the prosecutor asked Doyle during cross-examination "why he had not told the frameup story to Agent Beamer when he arrested [him]." 427 U.S. at 613-14. *Doyle* held: "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.*

In *Greer*, the Supreme Court pointed out that it has applied the *Doyle* holding only in cases where "the trial court has permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence." 483 U.S. at 764. The court compared the facts in *Greer* to those in *Doyle*:

> In contrast to these cases, the trial court in this case did not permit the inquiry that *Doyle* forbids. Instead, the court explicitly sustained an objection to the only question that touched upon Miller's postarrest silence. No further questioning or argument with respect to Miller's silence occurred, and the court specifically advised the jury that it should disregard any questions to which an objection was

> sustained. Unlike the prosecutor in *Doyle*, the prosecutor in this case was not "allowed to undertake impeachment on," or "permit[ted] ... to call attention to," Miller's silence. 426 U.S., at 619, and n. 10, 96 S.Ct., at 2245, and n. 10. The fact of Miller's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case.

483 U.S. at 764-65.

Here, Petitioner's case is like *Greer*, not *Doyle*. Petitioner's silence was *not* used to impeach him at trial. The reference to his post-Miranda silence was vague and minimal. The trial court twice gave jurors an instruction that the statement was stricken and that they must disregard it. The statement was redacted from the DVD that the jury took into their deliberations. This Court agrees that Petitioner failed to show prejudice under either the de novo or the deferential standard. Relief does not appear warranted, but Petitioner may respond to this preliminary conclusion.

### 2. Failure to Put Material Witnesses on at Trial

Petitioner's second ineffective assistance of counsel claim in the Amended Petition is that trial counsel should have called a jail informant, Jesse Romeo Rivera, to testify about admissions the State's witness, Christopher "Mike" Duran made in jail that implied that Duran, not Petitioner, killed Groat. Dkt. 20, p. 6.

In his original post-conviction action, Petitioner asserted that trial counsel knew that Rivera had informed law enforcement officers that he had a conversation in jail with Duran, and that Detective Becker had conducted an interview of Rivera at the Ada County Jail on October 12, 2012. State's Lodging C-1, p. 11.

MEMORANDUM DECISION AND ORDER - 19

On post-conviction review, the state district court summarily rejected the claim that trial counsel erred in not calling Rivera as a witnesses for the defense:

> The Record reflects that the defense provided the Court with a list of twenty-two witnesses and made changes to that list, reducing the number to seventeen, shortly before trial (Tr., p. 10.) Ultimately, the defense called four witnesses. Thus, it appears that defense counsel was making ongoing strategic adjustments to who was going to be called both prior to and during trial. Petitioner has offered no evidence to show that the failure to call Mr. Rivera was not simply trial strategy, but was due to inadequate preparation or other shortcomings. Further, although Petitioner alleges that had the jury heard Mr. Rivera's testimony that he would have been acquitted, the Court finds that there was significant evidence, even in the absence of Mr. Rivera's testimony, to support the conviction, and it is therefore unlikely that a jury would have acquitted Petitioner based upon the addition of the testimony of a jailhouse informant. Given the foregoing, the Court finds that the decision not to call Mr. Rivera was strategic in nature and will therefore not be second-guessed here. In addition, Petitioner has failed to support this claim with admissible evidence. It is not enough for Petitioner to allege that Mr. Rivera should have been called as a witness and that he would have testified to specific facts; rather, this information must be presented as admissible evidence through affidavits or other means not involving hearsay.

State's Lodging C-1, pp. 58-59.

However, after dismissal of Petitioner's post-conviction action was vacated and his action reinstated, this claim was not raised in the amended post-conviction petition by Petitioner's counsel, and, therefore, it was not raised on appeal. Petitioner complains that his post-conviction counsel removed many of his desired ineffective assistance of counsel claims (including this one) when counsel amended the post-conviction petition. (*See* State's Lodging E-1, p. 47, *et seq*.) Therefore, the claim is procedurally defaulted for

federal habeas corpus purposes. Rather than permit Petitioner to attempt to show cause and prejudice for the default, the Court will proceed to the merits of the claim.

Laying aside the issue of whether or not calling Rivera as a trial witness was a strategic decision, this Court nonetheless agrees that there is no admissible evidence in the record showing that Rivera was available to testify at trial or that the benefits of the proposed subject matter of his testimony would have outweighed any detriments that may have arisen on cross-examination. Accordingly, this claim appears subject to denial on the merits. Petitioner may rebut this preliminary conclusion in his response to this Order.

### 3. Failure to Investigate

In the Amended Petition, Petitioner alleges that trial counsel was ineffective when he failed to investigate the possibility that another person had a motive to kill the victim:

> One day after the victim's body had been discovered, police got a telephone call to the department's tip line. It came from a Daniel Salas, who had worked with the victim at Winco. In effect, Mr. Salas intimated the victim had [a]n ongoing affair with another man's wife, had drug debts, and feared for his life.

> Through Mr. Salas, a detective learned of a third co-worker, one Matt Moss, who had received text messages from the victim wherein reference got made to a gun. Purportedly, the police had obtained consent from Mr. Moss to search his cellular phone texts, but the record is devoid of what this inquiry found. Nor do the reports of the defense investigator hired in this case indicate any interviews with Messrs. Salas and Moss.

Dkt. 20, pp. 6-8.

In his original post-conviction petition, Petitioner articulated this claim as one that "[t]rial defense counsel failed to present essential witness testimony to rebut the State's

theory of the crime, information that was necessary to subject the State's case to meaningful adversarial testing." State's Lodging C-1, p. 13. The state district court rejected this claim because Petitioner failed to present any admissible evidence to show what each witness would have testified to and because defense counsel *did* present witnesses and cross-examine the State's witnesses, precluding a finding of a complete failure of a defense. *Id.*, p. 59.

This claim was not included in the amended petition or in the appellate briefing on post-conviction review. Therefore, it is procedurally defaulted because the Idaho Supreme Court was not given opportunity to rule on it. Like Petitioner's other ineffective assistance claim regarding potential trial witnesses, the Court agrees that there is no admissible evidence in the record showing that Salas, Moss, or anyone else was available to testify at trial or that the benefits of their testimony would have outweighed any detriments. Accordingly, this claim appears subject to denial on the merits.

## SUMMARY AND CONCLUSION

The Court will permit Petitioner to amend his Petition and consider it a supplement to the original Petition. Having reviewed the entire record, the Court finds it more judicially efficient to address Petitioner's claims on the merits than delve into the procedural defect issues apparent from the record. The Court preliminarily concludes that the claims are without merit and subject to denial and dismissal with prejudice. The Court will deny the Motion for Summary Dismissal because, if the sentencing claim were not meritless, the Court would permit Petitioner to amend his pleadings to state the factual basis of his claim and it would construe the claim as a procedurally-defaulted Eighth Amendment claim. The

Court will provide Petitioner with an opportunity to respond to this notice of intent to deny and dismiss his Amended Petition for Writ of Habeas Corpus on the merits. Thereafter, Respondent may file a reply, if desired. The Court will then revisit Petitioner's claims and issue a final order.

## ORDER

**IT IS ORDERED:**

1. Respondent's Motion for Summary Dismissal (Dkt. 17) is DENIED.

2. Petitioner's Amended Complaint, treated as a motion to amend with proposed amended complaint (Dkt. 20) is GRANTED.

3. Petitioner shall have **42 days** in which to file a response of 20 pages or less to the Court's Order showing entitlement to relief. Respondent may file a reply within **14 days** after the response.

4. Nothing further shall be filed in this case until the Court issues another order.

DATED: December 7, 2020

David C. Nye
Chief U.S. District Court Judge